**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAMINET COVER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 06 C 0548 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| HOME DEPOT USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In early 2001, Home Depot was looking for a suitable location in Chicago to open a new store. It was working with Rick Filler, a real estate broker who helped Home Depot find properties in the past. Filler found one near the intersection of Armitage and Cicero, and Home Depot entered into a contract with the owner to buy the property. However, a tenant had a lease that ran through June 30, 2002. The tenant was Laminet Cover Company, the plaintiff here. Because Home Depot wanted to open its store before the lease expired, it sought to buy out the lease from Laminet.

To induce Laminet to move out early, Home Depot offered to pay Laminet a little over $300,000 if it agreed to move out by July 1, 2001 -- a year before the scheduled termination of the lease. This offer was set forth in two written lease amendments entered into in March 2001. For unknown reasons, Laminet did not find a suitable property by July 1, 2001 and did not move out. Additional discussions between the parties re-started in the fall. Then, on November 4,

2001, Laminet's president, Michael Lieber, emailed Filler, offering to move out by January 31, 2002 for a payment of $195,000. Two days later, Filler emailed back stating that Home Depot was only willing to pay $140,000.

At this point, the parties dispute what happened. Lieber claims that he and Filler had a phone conversation a week later, on November 14, 2001, and they agreed on a price of $165,000. It is undisputed that there is no writing documenting this alleged oral agreement. Filler in his deposition, taken almost six years later, could not remember making a $165,000 offer after the exchange of emails. But whatever offers may have been made during this general period, Filler was adamant that Laminet never accepted any of them. He is likewise certain that everyone knew that Home Depot would not enter into an oral agreement.

In January 2002, Laminet moved out. It claims that it moved out early to fulfill its part of the November 14th oral agreement. Home Depot responds that it was not aware of any oral agreement and concluded that Laminet had abandoned the property when it moved out. Home Depot then took over the property and began fixing it up in preparation for the new store.

In 2006, Laminet filed this lawsuit, asserting four counts. Count I is a claim for breach of the oral contract allegedly entered into on November 14th. The remaining three counts are quasi-contractual claims -- promissory estoppel (Count II), promissory fraud (Count III), and unjust enrichment (Count IV). These claims are based on the same oral promise and allege that Laminet relied on that promise to buy a new property for its business. Home Depot later filed two counterclaims seeking unpaid rent for the five-month period after Laminet moved out and until the end of the lease in June 2002.

Before the court are cross-motions for summary judgment. Home Depot's motion only seeks judgment on Laminet's four claims. Laminet's motion seek judgment in its favor on both its claims and on Home Depot's counterclaims. For the reasons set forth below, we grant Home Depot's motion for summary judgment on Laminet's four claims and grant Laminet's cross-motion with regard to the counterclaims.

## FACTUAL BACKGROUND

Laminet is a family-owned business with 15 to 25 employees. Michael Lieber is an owner and the president, and he was the only person from Laminet involved in the events in this lawsuit. Lieber graduated from law school in 1987. Although he has never practiced as a litigator, earlier in his career, he worked for two years as an associate at Rudnick & Wolfe doing franchise, real estate, zoning, contract, corporate, and environmental law.

In this case, and on other earlier occasions, Home Depot used Rick Filler to help find properties for new stores. Filler is a real estate developer who works for the Harlem Irving Company. He is not an employee of Home Depot. As discussed below, the parties dispute whether, and to what extent, he was acting as an agent for Home Depot in the series of negotiations regarding the relocation agreements.

On March 1, 2001, after Home Depot had entered into a contract to buy the property, it entered into a Second Amendment to the lease with Laminet. The thrust of this agreement was that, once Home Depot became the owner of the property and assumed the lease, it would agree to pay Laminet $309,130 (plus other fees) if Laminet moved out by June 1, 2001. A few weeks later, the parties executed another lease amendment, entitled Third Amendment To Lease, extending the move-out date back a month to July 1, 2001. Under these two lease amendments,

Laminet had several months to find a new property to relocate its business and then move out of the leased property in return for a payment of $309,130.

Although these agreements are not the subject of the current breach of contract claim, they nevertheless set forth the context and expectation of the parties. Several points are worth noting here. First, both agreements are signed by Lieber on behalf of Laminet and by Randall Stephens on behalf of Home Depot. Stephens is listed as "Senior Corporate Counsel - Real Estate." Second, these agreements were drafted by lawyers, a point evidenced directly by Lieber's testimony that he hired a large law firm to negotiate for Laminet. Third, echoing the previous point, these agreements are complex and sophisticated agreements with elaborate procedures for triggering and documenting the sequence of events needed to carry out the planned early termination of the lease.

The Second Lease Amendment, in particular, is a detailed agreement. It has a lengthy cast of defined terms -- *e.g.* Tenant Execution Date, Outside Closing Date, Closing Notice, Landlord's Cancellation Fee, Relocation Condition, Tenant's Waiver Notice, Termination Date, Vacation Obligation. (Ex. E.) These capitalized terms are woven into a legal choreography of duties -- giving notice, placing funds in escrow, surrendering the premises, paying fees, and many other actions. To cite one example, Section 4(b) provides that the tenant should give the Landlord and Escrow Agent notice by providing an affidavit, defined as the "Vacation/Surrender Affidavit," that is signed by the Tenant's *president*, that *expressly* states that Tenant has in fact vacated the premises, and that is delivered *personally* to the Landlord's or the Landlord's counsel's office only at the *specific* locations set forth in Section 12 of the agreement. It is clear

from this provision and others that the parties took great care to think through contingencies and to prevent any misunderstanding about their intentions.

Laminet apparently was not able to find a suitable property or was not yet willing to move, and so the early lease termination did not go into effect. (It is not clear whether Laminet was obligated to move out by the July 1st date or merely had an option to do so.) Even though Laminet did not move out and did not receive the $309,130 early termination fee, it did keep $75,000 Landlord's Cancellation Fee.

It appears that further discussions about a possible early termination took place over the summer and early fall, although neither side has provided much detail about them. Of course, as each month passed, the value to Home Depot of an early lease termination decreased as the lease would eventually expire on its own terms. Then, as noted above, on November 4, 2001, Lieber sent an email to Filler. It stated:

> Rick:
>
> Thanks for getting back to me. However, I don't understand your number. Based on what you offered me the last time, which was solely based on the "carry" of the property, you are significantly less. Anyway, you asked for a counter, and my counter is 195. Please accept this. I need to coordinate a number of things to make the move happen, and I would hope to put your deal behind me and get it to the Lawyers while I am out of the office this week. Please advise ASAP.
>
> Michael

(Ex. K.)

Two days later, on Nov 6, 2001, Filler responded by email with a counter-offer. This email, which was CC'ed to Jim McPhail of Home Depot, stated:

> Michael:
>
> I spoke to Jim McPhail this morning regarding your counter proposal. Jim is willing to offer you $140,000 to vacate your leased premises by Jan. 31 [2002]. This offer seems to be very fair considering the money already paid to you. Please respond at your earlier convenience as Jim is anxious to put this behind him.
>
> Rick.

(Ex. K.)[1] The statement about the "money already paid to you" apparently is a reference to the $75,000 cancellation fee.

According to Lieber, one week later, on November 14, 2001, he talked to Filler on the phone. In that phone conversation, Filler allegedly made an offer on Home Depot's behalf that Home Depot would pay $165,000 for a January 31st termination.

Because Laminet's four claims rest entirely on this one statement by Filler in a phone call, we need to carefully consider the evidence regarding it. The first question is whether Filler in fact made an offer of $165,000. Laminet says yes. It relies primarily on Lieber's recollection. But it also believes that Filler "admitted" in his deposition that he made the offer. *See* Pl. Reply at p.4. This factual assertion in Laminet's brief is an overstatement and arguably misleading. When first asked in his deposition about whether he made a $165,000 offer, Filler testified that he never remembered any such offer. Under repeated questioning, in which Laminet's counsel tried to get Filler to at least acknowledge that he could not rule out that such an offer could have been made, Filler admitted that it was possible that an offer was made, although he repeatedly said that he could not remember what was said. And he was sure that, whatever offers may have been made, none were accepted by Laminet. Filler's deposition took place almost six years after

---

[1]To enhance readability, minor formatting changes were made in quoting this email.

the alleged conversation. In short, the evidence that Filler actually made the $165,000 offer is an issue in dispute. However, in considering Home Depot's motion for summary judgment, we will credit Lieber's testimony and proceed on the assumption that Filler did make the $165,000 offer.

The next question is whether Lieber accepted the offer over the phone. This point is not clear. The complaint states that a "representation" was made by Filler (*see* ¶ 4) and that Laminet relied on that representation and moved out (*see* ¶ 5.) The complaint thus gives the impression that the offer was not accepted orally over the phone but was accepted, indirectly, several months later by the act of moving out. This interpretation would at least fit with Filler's recollection that Lieber never accepted any offer, but it would also create additional problems for Laminet about whether it was reasonable to rely on an offer that was never explicitly accepted. The other interpretation, the one suggested in Laminet's briefs but not explicitly stated, is that Lieber accepted the offer over the phone. Again, consistent with the standards of summary judgment, we will assume that Lieber accepted the offer on the spot, rather than indirectly several months later.

A month before this conversation, on October 10, 2001, Laminet entered into a contract to purchase commercial property at 4900 W. Bloomingdale. The contract called for a closing date of December 1, 2001 or sooner. *See* Exs. G & H. On Nov 13, 2001, a day before the $165,000 offer was allegedly made, Laminet provided earnest money check for $78,000 for the new property. No evidence has been submitted to suggest that either Filler or Home Depot were aware that Laminet had already committed to the new property before November 14th.

One other factual issue is whether Filler was acting as the actual or apparent agent of Home Depot and, if so, what was the scope of his authority. Filler and Lieber were both asked

about this issue in their depositions. Filler testified that he never told Lieber nor anyone at Laminet that he had authority to bind Home Depot to the terms of any relocation agreement. (Ex. J at 60.) Filler also testified that he told Lieber that any discussions about a relocation agreement would eventually have to be reduced to writing. (*Id.* at 60-61.)

Lieber, in his deposition, was not entirely clear on this issue. When asked whether Filler told him that Jim McPhail at Home Depot would have to approve the terms of an agreement, Lieber stated that sometimes Filler would go back and talk over a term with Home Depot and that other times he would say "Yes, that's okay" on the spot. (Ex. I at 100-101.) In his affidavit, submitted after his deposition, Lieber made broader assertions about Filler's authority:

1. Jim McPhail of Home Depot told me on many occasions that Rick Filler was the contact person for dealings between Home Depot and Laminet.

2. Jim McPhail indicated to me that Rick Filler was authorized to discuss and negotiate terms relating to Laminet's surrender of the leased premises.

3. Laminet was told specifically by Jim McPhail of Home Depot to deal with Rick Filler, and all course of dealings suggest that Filler was empowered to make offers to Laminet as well as accept offers from Laminet.

(Lieber Certification at ¶¶ 1-3.)[2]

## **DISCUSSION**

The cross-motions raise two basic issues. The first one, which is the main focus of the parties' briefs, is whether Home Depot owes Laminet $165,000 based on the promise allegedly made by Filler on November 14, 2001. Laminet's four claims seek to recover this amount under

---

[2]Home Depot has filed a motion to strike this affidavit, arguing that it impermissibly expands upon testimony already covered in an earlier deposition. In light of our analysis below, we will not strike the affidavit because the result is the same even if it is taken into consideration.

either a breach of contract theory or alternatively under a quasi-contractual theory based on reliance. Both sides have moved for summary judgment on these four claims.

The second issue is whether Laminet owes unpaid rent, as well as related attorneys' fees, for the five months after it moved out of the building. This issue was introduced into this lawsuit by Home Depot's two counterclaims. Home Depot alleges that the original lease going through June 30, 2002 was never terminated. The total amount of unpaid rent is not clear in the counterclaims, which state that Laminet has failed to "pay all of the monthly rent of $5,384.50 through June 30, 2002." (¶ 7.) We assume that the $5,384.50 figure is a monthly amount, not the total sought, so that the amount paid is somewhere around $25,000. Of course, this would depend on the date on which Home Depot claims that Laminet abandoned the premises.

Laminet argues that it owes no more rent because the lease was terminated on January 31st under either one of two alternative theories: either by the oral agreement on November 14th (*i.e.* the first issue above) or by the parties' actions. Specifically, Laminet alleges that, after it moved out, Home Depot demolished the building, thereby impliedly accepting Laminet's implied offer to surrender the lease. Of course, if we find in Laminent's favor on the first issue, then it automatically follows that Laminet owes no unpaid rent and the second issue is moot. But the converse is not necessarily true. If we find in Home Depot's favor on the first issue, we must then assess the alternative theory of an implied agreement to surrender the lease. Such an agreement would differ from the first one in that it would be an agreement where both sides walk away with no obligation. Laminet would not owe additional rent but would not receive the

$165,000.[3] With regard to the counterclaim for unpaid rent, Laminet has moved for summary judgment. Home Depot has not. As discussed in Section II below, this second issue has been addressed only very briefly by either side as they focus almost entirely on the first issue.

**I.     Laminet's Four Claims Seeking $165,000.**

Home Depot offers three reasons why summary judgment should be granted in its favor on the four claims in the complaint. First, Filler had neither actual nor apparent authority to bind Home Depot to a modification of a prior lease agreement. Home Depot claims that any oral agreement in November 2001 would have been a modification of the two written lease amendments entered into in March 2001. Second, even if Filler could be considered Home Depot's agent, the alleged oral agreement was never put it in writing as required by the statute of frauds and by the no-oral-modification clause in the lease amendments. Third, Laminet did not detrimentally rely on the November 14th promise because it had already committed to purchasing new property to re-locate its business.

In response, Laminet first argues that it was reasonable in believing that Filler had authority to bind Home Depot to an oral agreement. This is an argument based on apparent authority as Laminet concedes that Filler had no actual authority to bind Home Depot. Laminet next argues the statute of frauds does not apply here because Illinois law contains an exception for a surrender of a lease. To support this argument, Laminet relies on three very old Illinois cases, the oldest being decided in 1896. As for Home Depot's reliance argument, Laminet does

---

[3]Laminet's opening brief overlooks this middle option and instead conflates these questions into an either-or proposition framed as follows: "Should Home Depot pay Laminet $165,000 for leaving early or should Laminet pay Home Depot rent for the months during which Home Depot was demolishing the building?" (Lam. Mem. at 1.)

not respond directly to the argument that it had already contracted to buy property at the time of the alleged oral promise. Instead, Laminet argues generally that Home Depot received a benefit for which it should pay under "[c]oncepts of both distributive justice and retributive justice." (Laminet Opp. Br. at 13.)

Although we agree that summary judgment should be granted to Home Depot on these four claims, we do not find it necessary to resolve any technical questions about the statute of frauds nor assess whether the no-oral-modification clause in the two lease amendments is enforceable under Illinois law. These questions miss the larger problem with Laminet's position. Was it reasonable under the circumstances for Laminet to believe that Home Depot was willing to be bound by an oral agreement made over the phone by a real estate broker not employed by Home Depot? Even viewing the facts and reasonable inferences in Laminet's favor, we find that no reasonable jury could conclude that Laminet was objectively reasonable in relying upon this assumption.

First some background legal principles. This case fits generally into a recurring fact pattern addressed in a number of decisions by Illinois courts and by the Seventh Circuit interpreting Illinois law.[4] As the Seventh Circuit has observed, business people often reach tentative agreements during the course of negotiations. Sometimes, as is alleged here, these agreements are made orally; in other cases, the parties have written document such as a letter of intent. Either way, a question arises as to whether these preliminary agreements (or promises)

---

[4]*See Quake Construction v. American Airlines*, 565 N.E.2d 990 (Ill. 1990); *Ceres Illinois. v. Illinois Scrap Processing*, 500 N.E.2d 1 (Ill. 1986); *Ocean Atlantic Dev. Corp. v. Aurora Christian Schools*, 322 F.3d 983, 995 (7th Cir. 2002); *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 432 (7th Cir. 1993); *Empro Mfg. Co. v. Ball-Co Mfg.*, 870 F.2d 423, 426 (7th Cir. 1989).

are binding by themselves or whether they become binding only when they are set forth in more formal written agreement. The simple answer is that it is a question of intent.

Before looking at how courts determine intent, it is important to acknowledge the larger policy concern underlying this question. As the Seventh Circuit has noted, "Illinois law recognizes the prerogative to agree to further negotiations, even after most essential contract terms have been settled, while remaining free to back out of a pending deal until the occurrence of some later event." *Venture Associates.*, 987 F.2d at 432. In *Empro Mfg. Co. v. Ball-Co Mfg.*, another often-cited case, the Seventh Circuit described it this way: "Illinois . . . allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics." 870 F.2d at 426. In short, as these cases recognize, there is a concern that parties will be hamstrung by extra costs and cumbersome negotiations if every statement made in the fluid process of negotiation could potentially subject them to a binding contract down the road. *See PFT Roberson. v. Volvo Trucks N. Am.*, 420 F.3d 728, 731 (7th Cir. 2005). Of course, this concern does not mean that the parties may not choose in some cases to proceed in an informal manner, but this assumption will not be made lightly.

In assessing this question under Illinois law, courts have looked at a number of factors, and the inquiry typically requires careful consideration of the particular facts of each case. *See, e.g.,Garwood Packaging v. Allen & Co.*, 378 F.3d 698, 704 (7th Cir. 2004) (contextual facts help show whether a statement by one party is "merely a prediction" or only "a signal of his hopes and intentions," as opposed to being a binding promise). One common way to express intent, not applicable here, is to include qualifying language in a letter of intent, such as a statement that the

preliminary agreement is "subject to" the execution of a final agreement. *See, e.g., Venture Associates*, 987 F.2d at 432. But this is not the only way intent may be manifested. *PFT Roberson*, 420 F.3d at 732 ("This magic-words approach is not the law in Illinois; the parties need not recite a formula to demonstrate that a definitive agreement lies in the future.").

Instead, as noted above, courts have looked at the totality of circumstances, including the parties' negotiation history and industry practices, among other things. For example, in *PFT Roberson*, the Seventh Circuit analyzed whether a 572 word email summarizing the terms the parties had "come to agreement on" could serve as a binding agreement when the parties never completed the final agreement. The Seventh Circuit said no, relying on (among other things) evidence of the parties' intent from their emails, which showed that "Volvo wanted a complete and formal arrangement before being bound." *Id*. at 730. The Seventh Circuit noted that Volvo's caution in this regard was "to be expected" given the size and nature of the transaction and also given industry practice. *Id.* at 731. The Seventh Circuit concluded: "This dispute should have been resolved in Volvo's favor on summary judgment." *Id.* at 733.

Applying these legal principles here, we find that the evidence taken as a whole shows a clear intent by Home Depot to be bound only upon a final and formal written agreement.

To begin with, it is worth noting that the purported agreement here was entirely oral. After the November 14th phone call, Laminet never communicated with Home Depot or Filler about the alleged agreement. Neither party has pointed to any writing, informal or otherwise, that summarizes or even acknowledges the existence of an agreement. No letters or emails. So this is not a case where the parties agreed orally to terms and later acknowledged the agreement in some form of writing. Here, the alleged oral agreement stands alone with no supporting

evidence. Though not dispositive, this point nonetheless raises at least a question as to why the parties did not put anything in writing. (More on this below.)

A second point is the agency issue. Laminet claims that it was reasonable in believing that Filler could make *and* accept offers on Laminet's behalf. The evidence supporting this claim is weak. Laminet's argument fails to recognize that agency is not necessarily an all-or-nothing proposition and an agent can have authority to do certain things and not others. The three statements from Lieber's affidavit, quoted above, refer to different and ascending levels of authority. Point 1 merely states that Filler was a "contact person" for Home Depot. This point is not controversial and Home Depot does not dispute it. Likewise with regard to Point 2. It only states that Filler was authorized to "discuss and negotiate" terms. Point 3 gets closer to the relevant issue but it does not directly answer the question. It states in the first half of the sentence that McPhail told Laminet to "deal with" Filler. This assertion is ambiguous at best and is consistent with the authority described in points 1 and 2 – namely, Filler was a person who carried out the mechanics of the negotiation process. The latter half of point 3 does address the key issue of whether Filler had the authority to "make" and "accept" offers. But the problem is that Laminet has no concrete evidence for this latter assertion. The only evidence cited in point 3 of the affidavit is the statement that "all course of dealings *suggest* . . ." that Filler had the authority to make and accept offers. However, Laminet never tells us what specific course of dealings led it to this belief.

This leads to the third and perhaps strongest point of all, the parties' course of dealings. The parties entered into the two lease agreements in March 2001 that were the same type of agreement as the one allegedly made in November. Yet, the parties in March were very careful

to hire lawyers, negotiate detailed provisions, and have them signed by high-level corporate representatives from each side. Neither agreement was signed by Filler. The agreements spelled out the parties' duties in detail and did not leave matters open-ended or undefined. In short, these agreements established context and the expectation of the parties. In light of this history, why would Home Depot suddenly be willing to drop its earlier formal method of entering into a contract in writing and decide to enter into the same basic agreement based on only a short phone conversation by an agent? Laminet never addresses this question and provides no explanation for why it believed that Home Depot would make this 180-degree turn in the way it did business.

A fourth and related point is the email exchange between Lieber and Filler a week before the alleged oral agreement. In Lieber's November 4th email to Filler, he made an offer and then asked that Filler respond quickly so that the parties could "get it to the Lawyers" while he was out of the office for the week. He asked for a response ASAP. This email shows, consistent with the parties' negotiating history, that Lieber expected that the parties would have to sign a formal written agreement. Tellingly, when asked in his deposition to explain why he wanted to get it to the lawyers, Lieber could not come up with an explanation. The only reasonable explanation is that Lieber knew Home Depot required a written agreement. Lieber's urgency to get the written agreement finalized ASAP shows that he knew that, without such an agreement, there was no deal. The contrary view – that the deal was already binding and the parties merely needed to finish up the paperwork -- is less consistent with this urgency.

A fifth and final point is that Lieber was not an inexperienced person without business experience or legal acumen. He had been president of Laminet for a number of years and, before

that, had worked as a transactional associate at a large Chicago law firm. Though he tried in his deposition to downplay the extent of his legal experience, the fact remains that he was a lawyer and had worked on agreements of this sort before. Undoubtedly, he knew the importance not only of dealing with a person who had authority but also of the general importance placed on written documents. In *Garwood Packaging v. Allen & Co.*, 378 F.3d 698 (7th Cir. 2004), the Seventh Circuit relied on a similar point in affirming summary judgment:

> [W]hat is a reasonable, and indeed actual, understanding will often depend on the knowledge that the promisee brings to the table. McNamara, with whom Martin primarily dealt, is a former investment banker, not a rube. He knew that in putting together a deal to salvage a failing company there is many a slip 'twixt cup and lips.

*Id.* at 704.

For all the above reasons, no reasonable jury could find that the parties intended to enter into a binding oral agreement under the undisputed facts of this case. These same reasons also preclude any recovery under plaintiff's three quasi-contractual claims as they all rely on the same oral promise allegedly made on November 14th.

The quasi-contractual claims fail for an additional reason. Laminet has represented – or, at least, given the strong impression – in its briefs that it purchased the property for its new location in reliance on the November 14th promise. Yet, as Home Depot has demonstrated, Laminet had already entered into a contract to purchase that property a month earlier. It therefore could not have been relying on the November 14th promise to buy the new property.

## II.     The Counterclaims For Unpaid Rent.

Having resolved the main issue discussed in the briefs, we now turn to Home Depot counterclaims for unpaid rent. As noted above, only Laminet moves for summary judgment on

this issue. Home Depot thus concedes that these claims involve fact disputes. Both sides have addressed this issue only cursorily with minimal legal analysis and only a few facts, perhaps because of the relatively small dollar amount involved.

The issue as framed by the parties has a factual and legal component. As for the facts, Lieber states in his affidavit that he observed Home Depot boarding up the building after Laminet moved out in January 2002; that in March 2002 he saw the front door knocked down; and that the gas, water, and electric had been turned off by April, 2002. Home Depot argues in response that Laminet's factual assertions are unsupported by anything in the record "other than" Lieber's affidavit. But this is not a valid response on summary judgment for two reasons. First, there is no requirement that a party present more than one affidavit. Lieber's testimony is enough as to matters he witnessed, and his statements are enough (if unrebutted) to establish that Home Depot began occupying the building. Second, Home Depot has not offered any counter-evidence to establish when it began moving in and remodeling the premises. Surely Home Depot has records to show when it began remodeling the premises, but for some reason it has chosen not to come forward with that evidence. Therefore, for purposes of Laminet's cross-motion, we take it as true that Home Depot began to occupy and use the property after Laminet moved out.

As for the legal analysis, Home Depot does not really address the issue substantively in the legal analysis section of its briefs. The only legal argument we could find is set forth Home Depot's response to Laminet's statement of material facts. (Resp. to Laminet Fact # 14 and 15.) There, Home Depot asserts that it had the right under paragraph 10 of the lease to demolish the building once it became clear that Laminet abandoned the lease. (Ex. C.) Even assuming that it

-17-

was clear that Laminet had abandoned the lease, a point Home Depot does not discuss, we do not see why that would give Home Depot the right to collect rent *if* Home Depot moved into and benefitted from the space. In fact, paragraph 10 does not specifically say anything about a right to demolish the building upon abandonment. Instead, it gives the landlord the right to re-let the premises, but the landlord must then give the former tenant credit for any rents collected. The general intent of this paragraph supports Laminet's position as Home Depot received a benefit from Laminet's early departure. In sum, even though the analysis and facts on this issue are thin, we can find no basis for proceeding to a full trial on this limited issue given that Home Depot has not contested that it took over the property. We therefore grant summary judgment to Laminet on the two counterclaims.

## **CONCLUSION**

For the reasons set forth above, Home Depot's motion for summary judgment is granted, and judgment is granted to Home Depot on Laminet's four claims. Laminet's cross-motion on the counterclaims is granted, and judgment is granted to Laminet on the counterclaims. This concludes this lawsuit.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** \_\_\_July 20, 2009_____